J-S13032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T. M., A/K/A T.J.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.I., FATHER | : : : : : : : | |
| | : | No. 1091 WDA 2023 |

Appeal from the Order Dated August 17, 2023
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  No. 63-23-0548

BEFORE:   KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.*

MEMORANDUM BY KUNSELMAN, J.:               **FILED: June 18, 2024**

M.I. (Father) appeals the decision of the Washington County Orphans'
Court, which granted the petition filed by Washington County Children and
Youth Services (CYS) and terminated his rights to his 9-year-old daughter,
T.M. (the Child), pursuant to the Adoption Act.  ***See*** 23 Pa.C.S.A. §
2511(a)(1), (a)(2), (a)(5), (a)(8), (b).  After review, we affirm.[1]

The record discloses the following factual and procedural history.  The
Child was born in 2013.  She came to the attention of CYS during the summer
of 2021.  The Child was living with Father's former paramour, K.R., who is the
mother of Father's other children – *i.e.*, the Child's half-siblings.  The Child
had not been in the care of either parent for some time.  Father was a resident

---

* Former Justice specially assigned to the Superior Court.

[1] The court also involuntarily terminated the rights of V.M. (Mother), who did
not appeal.

of New Jersey, while Mother was a resident of Texas. The Child had lived with Mother until the age of 5, when she was removed from Mother's care and placed with Father. How the Child came to live with K.R. was unclear, but by 2020, K.R. relocated from New Jersey to Pennsylvania with the Child and the Child's half-siblings.

During the Summer of 2021, CYS received reports that K.R. was not properly caring for the children in her home. The CYS intake worker contacted Mother and Father. What became of these initial contacts is unclear. In September 2021, CYS learned of additional allegations against K.R., specifically that she was leaving the children unattended for days. CYS also learned Father was prohibited from having contact with the Child, because of a New Jersey protective order obtained by K.R. that same month.[2] CYS arranged for the Child and her half-siblings to live with P.R., the mother of K.R.; but K.R. was allowed to have contact with the children so long as she was not under the influence.

In October 2021, the Child was admitted to a local psychiatric hospital after threats of self-harm. A couple weeks later, CYS learned that K.R. allegedly abused her children, which caused CYS to petition for dependency. Upon the Child's release from the hospital, CYS obtained a shelter order to formally remove the Child from K.R. and her parents. The Child's placement remained with P.R. Given that both parents resided outside of the

---

[2] The order also prohibited Father from having contact with K.R. or K.R.'s daughter.

- 2 -

Commonwealth, CYS evidently had difficulty obtaining proper service. At one point, CYS had to obtain a second reauthorization for the shelter care order.

The Child was ultimately adjudicated dependent in February 2022. The dependency petition alleged that Father had a criminal history, which included pending charges in New Jersey for simple assault, threat of serious bodily injury, harassment, aggravated sexual assault to a child older than 13 and less than 16, and endangering the welfare of a child. Father was denied visitation with the Child due to the protection order. The adjudicatory order directed Father to complete several objectives to aid with reunification. Father had to complete a sex offender evaluation; a drug and alcohol evaluation; and a mental health assessment. He had to refrain from drugs and alcohol, obtain housing, and resolve the pending criminal matters.

The juvenile court conducted three permanency review hearings prior to the termination hearing. At the first hearing, in August 2022, Father alleged that he participated in some of the required evaluations, but the court noted Father did not provide any verification. Father did not appear for the second hearing, which occurred in January 2023. Apparently, Father was incarcerated because of new criminal charges, separate from the pending charges regarding sexual abuse of a minor. At the third permanency review hearing, in June 2023, Father indicated that he hoped to "fast track" his criminal matters. The court concluded that Father continued to make no progress toward his reunification goals.

The orphans' court held a termination hearing on August 17, 2023. In its thorough opinion filed pursuant to Pa.R.A.P. 1925(a), the orphans' court summarized the testimony:

> At the TPR hearing, the Agency first presented testimony from caseworker Tenisha Brown. Brown testified that she has been the caseworker for [the Child], who was [nearly] 10 years of age at the time of the hearing, since approximately the end of 2021 to the beginning of 2022. Brown testified that at the time of Agency involvement, [the Child] was in Pennsylvania under the care of Father's former paramour, [K.R], with whom there were reported concerns of substance abuse. Brown testified that [the Child] was hospitalized and couldn't be released due to custody concerns. At that time, the Agency learned that [the Child] was in the care of her Mother until age 5 and then removed from Mother's care and placed with Father. At some point there was a report of sexual maltreatment by Father against one of [K.R.'s] other children and [K.R.] obtained custody of the children through a September 2021 final protection order.
>
> Brown continued to detail that in August of 2021, the Agency initially sought a shelter petition due to excessive drinking by [K.R.], who also reportedly hit her children. Consistent with the history stated above, Brown testified that [the Child] was adjudicated dependent in February of 2022. The adjudication was challenged by Father who requested reconsideration, however the adjudication was confirmed on March 7, 2022. Brown testified that the Agency had several concerns with Father, including the protection order preventing contact, the pending sexual assault on a minor charges and domestic violence concerns.
>
> Brown testified that the Agency had no evidence of Father engaging in a sexual offender evaluation. Similarly, Brown said the Agency had no evidence of Father engaging in Batterer's Intervention Counseling. Brown was aware of a mental health evaluation completed by Father and was further aware of a drug and alcohol assessment completed, resulting in a mental health treatment recommendation. Brown testified that the Agency was unable to obtain

- 4 -

accurate releases from Father to confirm information from mental health treatment and no drug tests for Father have been received by the Agency. Brown testified that Father continued to have outstanding criminal matters and failed to refrain from criminality, facing new 2023 burglary, unlawful possession and property damage charges. Furthermore, Brown testified that Father has not established safe and stable housing and in fact was incarcerated in January 2023, where he remained at the time of the hearing. The Caseworker testified that Father's current incarceration length is unknown and he continues to have two outstanding criminal matters.

Testifying as to [the Child's] contact with Father, Brown testified that contact was prohibited as a result of the outstanding PFA and the no contact order remained throughout the history of the dependency matter. Brown testified that Father provided no financial support for [the Child], sent no gifts, cards or letters to [the Child], failed to provide for the daily needs of [the Child] and did not make [the Child] a priority. The Caseworker reported that neither Mother or Father actively participates with [the Child's] medical and/or educational needs and at the time of the hearing [the Child] was out of parental care twenty-two (22) months. In the present matter, [the Child] was adjudicated dependent on February 16, 2022 and the TPR petition was filed by the Agency on March 29, 2023. The hearing on the TPR was conducted on August 17, 2023. (Eighteen months after adjudication).

According to Brown, while Father failed to perform these basic functions, [the Child] remained and remains in an undisclosed foster home where she engages in therapy, performs well in school and continues to thrive. The Caseworker testified that [the Child] is able to verbalize her wants and has indicated that, although she wishes to have some contact with Mother, she wants to be adopted, and stay in her foster home.

Through additional testimony, Brown testified that when [the Child] was adjudicated dependent in February of 2022, Father was not incarcerated. Brown acknowledged that Father had nearly a year to work on court-ordered services when he was incarcerated in January of 2023 and failed to do so. Additionally, while the record supports some mental

health treatment for Father, documentation evidencing such treatment consists of information regarding two, one-hour sessions, not the weekly mental health counseling recommended and court ordered.

Testimony was next received from [an] expert in forensic psychology, Dr. Neil Rosenblum. Dr. Rosenblum testified that he did an evaluation with [the Child] on January 11, 2023. [The Child] gave him background information indicating that she did not remember a lot about her birth Mother. The Child knew that her Mother had gone to jail and she was removed from her care.

Rosenblum testified that [the Child] described her time with Father as "unpleasant." Rosenblum characterized the time as being a "struggle for the child." By way of further explanation, Rosenblum testified regarding [the Child's] relationship with [K.R.], who treated her own children better and [the Child's] witnessing fighting between her Father and [K.R.]. According to Rosenblum, [the Child] moved to Pennsylvania sometime in 2020 and/or 2021.

Rosenblum performed an interactional evaluation between [the Child] and her Foster family. At the time of the evaluation, [the Child] was in the foster home for a year and was reportedly safe and secure with the foster family. Rosenblum testified that the Child had a "low understanding of family." Rosenblum also completed a virtual interactional with [the Child] and her Mother, but was unable to do an individual and/or interactional evaluation with Father.

Nevertheless, based on the evaluations completed, Rosenblum offered a permanency recommendation of adoption. In support of his recommendation, Rosenblum testified that, [the Child], at 9 years of age, has had a series of disruptions in her life and has lived in multiple states and locations. Rosenblum testified that the Child has trauma, a rule out of Reactive Attachment Disorder, difficulty trusting people and suicidal ideations. Additionally, Rosenblum testified that [the Child] verbalizes the desire to be adopted and the Child's identity is established here in Pennsylvania with the foster family.

Rosenblum opined that continued contact should occur with birth mother, but that is not a stable placement. Rosenblum recognized that Mother had no in-person visitation with [the

Child] during the dependency matter and Mother said that in-person visits were cost prohibitive. While Rosenblum did not evaluate Father, he opined that Father was also not a valid reunification option considering [the Child]'s emotional needs and Father's circumstances. Rosenblum testified that [the Child] did not speak about Father, except for describing trauma in the home environment between Father and her step-mother. Rosenblum did not completely dismiss the ability of Father having a relationship with [the Child] in the future, but opined that presently, Father is not a placement option and further noted, although only hypothetically, that it was unlikely that [the Child] had an attachment with Father.

Rosenblum testified that [the Child] has the most trusting relationship with her foster parents and the benefits of adoption outweigh any detriment of terminating parental rights. Rosenblum testified that [the Child] is fortunate to have connected with her foster family and finds any alternative for the Child "very risky." Rosenblum emphasized trust, belonging and identity throughout his testimony.

Father, although incarcerated, appeared and provided testimony virtually through the video Polycom.

Father testified that he last saw [the Child] on July 19, 2020 and then the protection order was put into place. Despite the protection order, Father testified that he believes that [the Child's] statements are confused when she was "alienated from him."

Father was specifically questioned regarding the requirements in the dependency matter and although littered with narratives involving court actions in other jurisdictions, Father provided responses to each of the specific services listed. When asked if he completed the sexual offender counseling, Father indicated that he had not but agreed with his counsel that he thought this requirement was stayed by the Court pending the adjudication of his other matters. Father provided a similar response with regard to batterer's counseling. In response to whether he participated in a mental health evaluation, Father responded that he did a drug and alcohol evaluation through his pre-trial services that recommended mental health treatment.

Father testified that he received services from an organization named Mind Your Mind. Father indicated that he engaged with these services weekly, even seeing counselors while incarcerated.

Father submitted documentation supporting two meetings with Mind Your Mind on August 12 and August 15, 2022. Father testified that he did drug testing in New Jersey. In response to whether he had safe and stable housing, Father indicated that he once had a two-bedroom place but was unaware if his kids were coming back to New Jersey or staying in Pennsylvania. Father acknowledged that there was a period of approximately fourteen months where he was not incarcerated and available to complete services, but failed to do so.

Father was asked about the best interests of Child, inasmuch as quite amount of time has passed since he has last seen [the Child.] To demonstrate his relationship with [the Child], Father described the time when she lived with him indicating that he was a "stay at home dad" and would be home all day and they would "just hang out" and do "snack and homework after school." When he was asked his opinion on whether a termination of his parental rights would be detrimental to [the Child], Father responded that he absolutely believed it would be detrimental indicating that, "when I am done here, I will be back with my other children and she is going to see that and it will be hurtful to [the Child]." Nevertheless, Father acknowledged that he last saw [the Child] on July 19, 2020 with the protection order preventing contact after that time. In later testimony it was established that Father's time with [the Child] started when she was approximately 5 years of age. Father testified, "[the Child] was five when she came into the picture.... When she came into my household." Father later testified that she was with him for a little over a year and went through kindergarten while living with him.

Father testified that his trial regarding the sexual assaults is scheduled for September 11, 2023 and no trial is scheduled to date on his burglary charges. Father acknowledged that his sexual assault charges involve sexual penetration of a victim under the age of thirteen for activity alleged to have occurred from 2015 through 2019, however Father indicates that his plea agreement only involves his use of alcohol.

Father testified that he was willing to come to Pennsylvania, however he never did and Father agreed it was unfair for [the Child] to be in limbo while he handled his pending and outstanding criminal charges, but declined to acknowledge that his present incarceration would continue to prevent reunification with [the Child] even in the absence of the protection order.

T.C.O., 10/19/23, at 15-21 (footnotes omitted) (style adjusted).

The orphans' court issued its termination order the same day, August 17, 2023. Specifically, the court determined that CYS proved grounds for termination existed under 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), (b).

Father timely filed this appeal. He presents the following issue for our review:

Whether the trial court erred by terminating the parental rights under 23 Pa.C.S.A. § 2511(b) when the trial court failed to give the proper weight of [*sic*] Appellant's evidence and testimony.

Father's Brief at 7.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that

- 9 -

often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted).

Father does not challenge the orphans' court's decision under Section 2511(a), thereby conceding the first prong of the bifurcated termination analysis. Rather, Father opts to present a narrow challenge under Section 2511(b). That subsection provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare

- 10 -

of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

On appeal, Father argues that the orphans' court should have weighed more heavily his testimony that he completed the court-ordered evaluations, and that he provided documentation of the same to CYS. He maintains that he was approved for a home loan, that he only had to pick out a suitable place for the Child, and that he notes that he had exercised custody of the Child in the past – the apparent inference being that he could provide appropriate care again. Additionally, Father argues that "the Agency never moved on his sister's submission [to be a placement resource] and therefore the evidence was not given any weight in the court's decision in terminating Father's parental rights." *See* Father's Brief at 11-12, 13.

These arguments fail for several reasons. First, Father cannot dictate how much weight the orphans' court places on the evidence, which includes his testimony. *See, e.g., A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014). To that end, issues of witness credibility are directly within the trial court's purview. *T.S.M.*, 71 A.3d at 267. Additionally, it is not the role of this Court to search the record for evidence that would support a contrary result. *See id.* But more to the point, these arguments largely concern Section 2511(a),

which focuses on the parent's conduct. The focus of a Section 2511(b) analysis is on the Child. **C.M.K.**, 203 A.3d at 261-62.[3]

Father presents only one argument relevant to the Section 2511(b) analysis – namely, that the court should have continued the matter so that he could be evaluated by Dr. Rosenblum. According to Father, the evaluation would show he has a bond with the Child. Father maintains that without his participation, Dr. Rosenblum's report should not have been given so much weight. **See** Father's Brief at 11-12.

Preliminarily, however, we conclude that Father did not preserve this argument for our review. Neither his concise statement of matters complained of on appeal, nor his statement of questions involved challenge the expert report and expert testimony, either explicitly or implicitly, in contravention of Pa.R.A.P. 2116(a).[4] Moreover, this argument is presented without any citation to relevant legal authorities, in contravention of Pa.R.A.P. 2119(a). As such, Father waived this challenge.

_____

[3] The propriety of Father's housing is relevant to Section 2511(b), but only insofar as the court may not terminate his rights based **solely** on inadequate housing. **See** 23 Pa.C.S.A. § 2511(b). The court did not do so here, and we need not discuss the point further.

[4] We do not find that this claim constitutes a subsidiary question of, or a question fairly suggested by, the issue Father presented in his statement of questions involved section of his brief. **See** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). Frankly, the statement of questions involved is, itself, a subsidiary of the issue presented in Father's concise statement.

- 12 -

Even if we addressed this argument, we would conclude it merits no relief. First, the court did not even need to consider Dr. Rosenblum's testimony or report to conduct a proper Section 2511(b) analysis. "When conducting a bonding analysis, the court is not required to use expert testimony." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Put plainly, because expert testimony is not required, Father's lack of participation in the expert evaluation does not render the court's Section 2511(b) analysis erroneous. Father did not need an interactional evaluation by Dr. Rosenblum to demonstrate he had a bond with the Child. Moreover, when it considered Dr. Rosenblum's evaluation, the orphans' court appropriately accounted for Father's absence. Indeed, Dr. Rosenblum also accounted for Father's absence by hedging his recommendation.

Significantly, the question under Section 2511(b) is not merely whether a bond exists. As the Supreme Court explained, trial courts must determine whether the child has a bond with the biological parent, the nature of that bond, and effect that severance of the bond would have on the child. *In the Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023) (citing *T.S.M.*, 71 A.3d at 267, 269). Thus, the question for the court is whether termination would sever a necessary and beneficial bond. "[T]o grant termination when a parental bond exists, there must be clear and convincing evidence that the

bond is not necessary and beneficial." *Id.* at 1114.[5]  The Supreme Court held that the trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.*

Moreover, our Supreme Court cautioned the parent-child bond inquiry is but one factor to consider under a proper Section 2511(b) analysis. *Id.* at 1111 (citing *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).  "[B]ond, *plus* permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis."  *Id.* at 1109 (emphasis added).  The Supreme

---

[5] The Court recognized that severance of *any* bond could have an "adverse impact" and upset the child.  Therefore, courts must focus on the *nature* of the bond commensurate with the impact of severing that bond:

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present.  By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm.  Moreover, by evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

*K.T.*, 296 A.3d at 1109-1110 (footnotes and internal citations omitted).

- 14 -

Court held that trial courts have discretion to place appropriate weight on each factor before making a decision under Section 2511(b). *Id.* at 1113.

Here, the orphans' court determined – as part of its more general Section 2511(b) analysis – that there was no evidence of a parental bond worth preserving. The record supports this determination. Thus, even if we were to consider Father's argument regarding his lack of participation in the forensic evaluation, we would conclude the argument merits no relief.

In sum, we conclude the orphans' court did not err or abuse its discretion when it terminated Father's rights under Section 2511(b). The orphans' court was within its discretion to afford little weight to Father's reasons why his rights should not be terminated.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/18/2024